YONIR TECHNOLOGIES, INC. and
David Felder, Plaintiffs,

v.

DURATION SYSTEMS (1992)
LIMITED, Defendant.

No. 01 CIV.8462(CM).

United States District Court,
S.D. New York.

Nov. 25, 2002.

Andrew J. Goodman, Kurzman, Eisenberg, Corbin, Lever & Goodman, LLP, New York, NY, for plaintiffs.

John F. Volpe, Alan B. Clement, Hedman & Costigan, New York, NY, for defendant.

## MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION TO VACATE ARBITRATION AWARDS AND DENYING DEFENDANT'S CROSS–MOTION TO CONFIRM ARBITRATION AWARD

McMAHON, District Judge.

Plaintiffs Yonir Technologies, Inc. ("Yonir") and David Felder ("Felder") and Defendant Duration Systems (1992) Ltd. ("Duration") are participating in an ongoing arbitration regarding the dissolution of their joint venture. *See Yonir Technologies, Inc. and David Felder v. Duration Systems (1992) Limited.* Case No. 19 104 0098801. A Demand for Arbitration was filed with the American Arbitration Association ("AAA") on September 4, 2001, and

the arbitration is being held before a panel of three arbitrators ("the Panel")[1]. The Panel has issued a number of letter directives since arbitration began, but has not yet finally resolved all issues relating to the dissolution of the joint venture.

On October 22, 2002, the Plaintiffs petitioned the New York State Supreme Court, by an Order to Show Cause and Verified Petition ("Plaintiffs' Petition"), seeking to vacate five directives issued by the Panel. Plaintiffs asked that enforcement of these directives be stayed pending determination of their petition. The petition was supported by a Memorandum of Law in Support of Petitioners' Motion to Vacate an Arbitration Award. ("Plaintiffs' Memo."). One of the directives challenged by Plaintiffs required the parties to execute a contract with the Reston Group, a third-party service provider, by October 22, 2002. Pursuant to the request to stay the directives, the Honorable Bruce Allen of the New York State Supreme Court issued an order that, pending hearing of the motion, Plaintiffs not be required to execute The Reston Group contract. Judge Allen scheduled a hearing for October 24, 2002.

Defendant removed this action to federal court on October 23, 2002, pursuant to 28 U.S.C. §§ 1332 and 1441. On November 4, 2002, Plaintiffs' counsel asked for a hearing on the pending Order to Show Cause. On November 8, 2002, Defendant filed an Opposition to Plaintiffs' Motion to Vacate Arbitration Awards ("Defendant's Opposition"), and cross-moved for confirmation of an award issued in the September 17, 2002 letter. Defendant also requested that the Court issue orders mandating compliance with the challenged directives, including orders directing the petitioners: to sign The Reston Group Contract; to return $132,877.18, with interest; to the JV accounts, and to arbitrate in good faith. (Defendant's Opposition, p. 8–9).

On November 12, 2002, the parties appeared before this Court for a hearing on the Order to Show Cause. Earlier that day, Plaintiffs filed a Reply Memorandum in Support of the Motion to Vacate an Arbitration Award ("Plaintiffs' Reply") and Defendant filed an Answer to Plaintiffs' verified petition ("Defendant's Answer"). I extended Judge Allen's stay pending this decision.

I now deny the pending motions as explained below and vacate the stay issued by Judge Allen.

## FACTS

Defendant Duration is a corporation organized and existing under the laws of, and having its principal place of business in, the Country of Guernsey, in the Channel Islands. (Defendant's Answer, p. 2) Plaintiff Yonir is a New York Corporation. (Plaintiffs' Petition, p. 1). Plaintiff Felder is the President and sole stockholder of Yonir, and a resident of the State of New York, County of Westchester. (Plaintiffs' Petition, p.1).

In June 1992, Plaintiffs entered into a joint venture with a company that later assigned the joint venture to Duration. (Plaintiffs' Memo., p. 2). The joint venture operated in the State of New York. Its business was the procurement and sale of avionic parts for both civilian and military aircraft. The companies continued the joint venture until approximately August 2001, when Duration filed an action in this District, declaring the formal termination

---

1. The arbitration has since been administratively transferred to the International Center for Dispute Resolution ("ICDR").

and dissolution of the Joint Venture and bringing an action for damages and other relief against Petitioners. (Plaintiffs' Memo., p. 2). In September 2001, the action was voluntarily discontinued, and the parties commenced an arbitration proceeding before the American Arbitration Association, pursuant to the arbitration provision of their joint venture agreement. (Agreement between Yonir and Mala [Duration's successor in interest], June 1, 1992, Ex. A to Plaintiffs' Petition.) This action was later transferred to the ICDR. (Reply Affidavit of Peter J. Mutino, Esq., November 12, 2002, ("Mutino Aff.") ¶ 3).

In the Claims for Relief Sought attached to their Demand for Arbitration, Yonir/Felder asked the arbitrators to set up a procedure for dividing the joint venture's inventory; to order Duration to reimburse them for the costs of operating the joint venture; and to award them damages for actions and failures of Defendant. (Claims for Relief Sought, Ex. 3 to the November 7, 2002 Affidavit of Jeffrey Campisi Esq. ("Campisi Aff.")). Defendant later filed a counter-claim for relief, asking the arbitrators for detailed relief to effectuate the wind up of the joint venture. (Claims for Relief Sought on Counterclaim, Ex. 56 to the Campisi Aff.). Defendant also sought damages. *Id.* The Panel has not yet held a hearing on all of the issues for which the parties require resolution (Defendant's Opposition, p. 1), but it has already issued a number of directives. Plaintiffs seek to vacate five of these directives. Defendant cross-moves to have an additional directive confirmed.

## A. The First Challenged Award: The Reston Group Contract

The parties agreed that the Panel should establish a procedure for the division of their physical inventory. (Defendant's Opposition, p. 5; Plaintiffs' Claim for Relief Sought, ¶ 1, Ex. 3 to Campisi Aff.; Defendant's Claims for Relief Sought on Counterclaim, ¶ 1, Ex. 56 to Campisi Aff.) The record reveals that the Panel held meetings and telephone conferences, and received written submissions from the parties' attorneys, on this issue. (Mutino Aff. ¶ s 2–11; Campisi Aff. ¶ s 24–48). Mr. Mutino, the attorney for Yonir/Felder, proposed at the first meeting that Yonir employees divide the inventory. (Campisi Aff. ¶ 24). Mr. Campisi, the attorney for Duration, subsequently submitted Defendant's sixteen-page counter-proposal to the Panel, with eight supporting exhibits attached. (Letter from Campisi to the AAA, Dec. 14, 2001, Ex. 5 to Campisi Aff.; Campisi Aff., ¶ 27). Plaintiffs were permitted to respond to the Defendant's proposal, and submitted a twenty-two page response. (Letter from Mutino to the AAA, Dec. 24, 2001, Ex. 6 to Campisi Aff.). A conference call was held between Counsel and the Panel to discuss the issue. (Letter to Counsel from AAA, January 24, 2002, Ex. 7 to Campisi Aff.). Both sides were given the opportunity to identify third-party vendors who could assist with the process of evaluating and dividing the inventory. (Letter to Counsel from AAA, January 24, 2002, Ex. 7 to Campisi Aff.; Letter from Campisi to AAA, February 6, 2002, Ex. 8 to Campisi Aff.; Letter from Mutino to Campisi, February 5, 2002, Ex. 9 to Campisi Aff.).

At the end of the selection process, the Panel chose The Reston Group to divide the inventory. By letter directive on May 22, 2002, the Panel ordered, "The parties are to go forward with the inventory project by engaging Reston according to the terms of its proposal." (Letter to Counsel from AAA, May 22, 2002, Ex. 13 to Campisi Aff.). The Panel stated that it discussed Mr. Mutino's concerns regarding the "open-ended [contract] proposal" submit-

ted by The Reston Group, but noted that Reston had advised that the proposal was as precise as possible. *Id.*

On June 27, 2002, The Reston Group advised the Panel that it could not reach an agreement with Yonir and Duration on the terms of the engagement, and was withdrawing its bid. (Letter to AAA from Reston Group, Ex. 15 to Campisi Aff.). Reston stated that it would only be willing to submit a new bid if certain principles were adhered to in contract negotiations. *Id.* One of these principles was that Reston would only deal with a single spokesperson. *Id.*

During a July 1, 2002 conference with counsel, the Panel informed the parties that the Reston Group would be submitting a new contract proposal, and that the Panel Chair would be the point person for communicating with Reston. (Mutino Aff. ¶ 9; Campisi Aff. ¶ s 41). On July 29, 2002, the Panel informed counsel that it had discussed The Reston Contract and that it would be discussing a final draft with The Reston Group. (Letter from AAA to Counsel, July 29, 2002, Ex. 47 to Campisi Aff.). According to a case status report prepared by Defendant for the ICDR case manager, the Panel undertook to "finalize The Reston Group Contract for the division of inventory." (Letter to ICDR from Campisi, August 15, 2002, Ex. 20 to Campisi Aff.). After reading the Defendant's case status report, Plaintiffs sent a letter to the ICDR manager indicating that they agreed with the portion of the status report about the Reston contract. (Letter to ICDR from Mutino, Aug. 15, 2002, Ex. 21 to Campisi Aff.). While neither party has submitted the Reston Group Contract as an exhibit, it appears that the Panel did in fact negotiate a contract with Reston, since the Panel issued the following directive on October 15, 2002:

> The Panel requests that each party execute and return the Reston Group Agreement by October 22, 2002.

Plaintiff seeks to vacate that directive.

## B. The Second Challenged Award: Joint Venture Monies

On January 10, 2002, Counsel for Duration Systems notified the AAA Case Manager that Plaintiffs' counsel had sent Duration checks totaling $70,000.00 of joint venture funds, with a notation that: "Yonir Technologies, Inc. would be withdrawing a similar amount from the bank account" (Letter from Campisi to AAA, January 10, 2002, Ex. 28 to Campisi Aff.). Defendant's counsel attached the checks as an exhibit to his written submission. *Id.* On January 16, 2002, the AAA sent a letter to counsel, memorializing a conference call held among the Panel and counsel on January 14, 2002 and issuing the following directive:

> The panel directs that all monies received by the joint venture be retained by the joint venture until the conclusion of this arbitration and the further order of the panel. To that end, the panel directs Mr. Campisi to return to Mr. Mutino the two checks totaling $70,000.00 payable to his client for voiding and directs Claimant to repay $70,000.00 to the joint venture.

(Letter to Counsel from AAA, January 16, 2002, Ex. 29 to Campisi.).

On January 23, 2002, Plaintiffs sent a letter to the Panel seeking reconsideration. (Plaintiffs' Letter to AAA, January 23, 2002, Ex. 30 to Campisi Aff.). Defendant responded on January 31, 2002 with a vigorous objection to a reconsideration (Letter from Defendant to AAA, January 16, 2002, Ex. 31 to Campisi Aff.). On February 7, 2002, the Panel sent a letter to parties informing that "After consideration of the contentions of the parties, the arbi-

trators have denied the request to reconsider the distribution of the monies in the joint venture." (Letter from AAA to Counsel, February 7, 2002, Ex. 33 to Campisi Aff.).

Despite the denial of the request for reconsideration of the January 16, 2002 award, Plaintiffs failed to comply with the Panel's directive. On July 15, 2002, Plaintiffs indicated that they had distributed $265,754.36 in joint venture funds, half to themselves and half to Yonir. (Letter to Defendant from Plaintiff, July 15, 2002, Ex. 44 to Campisi Aff.). On July 23, 2002, the Panel issued an additional directive:

> As previously ordered by letter date January 16, 2002, all monies received by the joint venture are to be retained by the joint venture until the conclusion of the arbitration and the further order of the panel. Therefore, the claimant is to leave $150,000 in the attorney's escrow account of the Claimant's counsel and all other monies paid out of the Joint venture are to be returned to its accounts on or before August 10, 2002.

(Letter to Counsel from AAA, July 29, 2002, Ex. 47 to Campisi Aff.). On July 30, 2002, Plaintiffs asked the Panel to rescind its directive "concerning the return of monies to the joint venture account" (Letter to AAA from Plaintiff, July 30, 2002, Ex. 48.).

## C. The Third Challenged Award: Joint Venture Inventory

Plaintiffs maintain that, as the remaining partner of the joint venture, they are entitled to continue the business of the joint venture during the dissolution process. (Plaintiffs' Letter to Duration, September 13, 2001, Ex. 25 to Campisi Aff.; Plaintiffs' Reply, p. 6–9). On January 23, 2002, at the Panel's request, Plaintiffs' submitted sales records and invoices to the Panel, and copied Defendant. (Plaintiffs'

Letter to AAA, January 23, 2002, Ex. 30 to Campisi Aff.). On January 31, 2002, Defendant responded with a letter to the Panel, stating that Duration had not seen all of the sales invoices until Plaintiffs' submission, and raising concerns about Plaintiffs' unilateral actions in respect to sales. (Defendant's Letter to AAA, January 31, 2002, Ex. 31 to Campisi Aff.).

The dispute between the parties over Plaintiffs' sales of joint venture assets escalated between March and July of 2002. The parties sent at least six written submissions to the Panel during this time, in which Defendant disputed the propriety of sales of joint venture assets and Plaintiffs maintained that such sales were appropriate. (Letters from Counsel to Panel, March 19, 2002, April 2, 2002, May 14, 2002, May 21, 2002, July 2, 2002, July 15, 2002, July 16, 2002, Exs. 34, 36, 38, 39, 41, 44, 45 to Campisi Aff.). These submissions were often quite detailed, and some refer to supporting documentation. *Id.*

On July 29, 2002, the Panel issued the directive:

> There are to be no sales of inventory, without the panels' [sic] approval. In addition, the claimant is to give the respondent an inventory of what has been sold and for how much, copying the Association.

(Letter from Counsel to AAA, July 29, 2002, Ex. 47 to Campisi Aff.). In the Panel's September 17, 2002 letter, it repeated the directive that no sales were to take place, and clarified the directive in regard to sales for national security purposes. (Letter from ICDR to Counsel, September 17, 2002, Ex. 51 to Campisi Aff.). The Panel also directed Plaintiffs to provide proof of compliance with its directive, and provide the defendant with sales records and bank statements. *Id.* The record suggests that Yonir may be continuing to sell joint venture inventory

without Panel approval. (Letter to ICDR from Defendant, September 4, 2002, Exhibit 66 to Campisi Aff.).

### D. The Fourth Challenged Award: Retention of CPA

The Parties' joint venture agreement provides that: "Yonir will keep a separate inventory, bookkeeping and record systems of all matters related to the joint project and will issue annual accounts. Mala [Duration's predecessor in interest] will be entitled to inspect the said inventory, books and records, by prior request, at any time." (Agreement between Yonir and Mala, June 1, 1992, Ex. A to Plaintiffs' Petition.) In Duration's cross-claim submission for relief to the AAA, it seeks:

> Appointment of a receiver or qualified neutral third party with authority to oversee the winding up and to collect and distribute all Joint Venture assets, pay all Joint Venture debts and distribute surplus assets/divide inventory to the joint venturers according to their respective shares.

(Defendant's Claims of Relief Sought on Counterclaim, ¶ 3, Ex. 56 to Campisi Aff.).

In Defendant's submissions to the Panel between January and July of 2003, discussed in Fact Section (C), *supra*, Defendant repeatedly raised concerns about the accounts of the joint venture, and Yonir's exclusive control over them. (See e.g., Letter from Duration to AAA, July 16, 2002, Ex. 45 to Campisi Aff.). On July 1, 2002, a preliminary hearing was held, and on July 3, 2002, the Panel sent a letter to counsel memorializing its post-hearing orders, including a procedure for the selection of a CPA or a CPA firm willing to prepare an accounting. (Letter from AAA to Parties, July 3, 2002, Ex. 58 to Campisi Aff.). Pursuant to the terms of the July 3, 2002 letter, Plaintiffs provided Defendant with a list of three CPAs who were willing to prepare an accounting. (Letter from Plaintiff to Defendant, July 15, 2002, Ex. 59 to Campisi Aff.). Correspondence was exchanged between the parties, copying the AAA, regarding the qualifications of the CPAs. (Letters between Counsel on July 17, 2002, July 25, 2002, July 31, 2002, August 20, 2002, Exs. 60, 61, 63, 64 to Campisi Aff.).

On September 4, 2002, Defendant raised concerns with the AAA over unexplained entries in financial transaction reports. (Letter from Defendant to AAA, September 4, 2002, Ex. 66 to Campisi Aff.). On September 17, 2002, the Panel issued the following directive:

> Since Respondent has no objection to any CPA firm proposed by Claimant, Claimant is directed to inquire of each proposed firm whether the firm would be willing to audit and pay the ongoing bills of the Joint Venture during the progress of this arbitration and maintain signature authority over a bill-paying account. Claimant is directed to engage any of the proposed firms willing to do so or to pick one firm if more than one is willing to do so.

(Letter from AAA to Parties, September 17, 2002, Ex. 51 to Campisi Aff.). Plaintiffs challenge this directive as well.

### E. The Fifth Challenged Award: Sanctions

The Fifth disputed "award" is found in an October 28, 2002 letter from the Chair of the Panel to the Case Manager, where he states:

> The parties are reminded that the Panel will entertain requests for sanction at the appropriate times against a party disregarding its orders.

(Letter from Panel Chair to ICDR Case Manager, Oct. 28, 2002, Ex. 55 to Campisi Aff.).

Clearly, this statement is not an award at all, but a reminder that the Panel has the power to sanction non-compliant parties. As it is not an award, it is not subject to a motion to vacate. I will not consider it further.

### F. The Award Defendant Seeks to Have Confirmed: Bank Statements

Defendant has repeatedly maintained that it has a right to see the bank statements of the joint venture, and submitted this request to Plaintiffs and Panel in the context of disputing sales and asset issues, as discussed above in Fact Sections C and D, *supra.* (See, e.g., Letter from Defendant to AAA, January 21, 2002, Ex. 31 to Campisi Aff.)(questioning a payment from a joint checking account and submitting that they are entitled to see bank statements).

In its letter to parties on September 17, 2002, the Panel issued the following directive:

Copies of bank statements and all reports received by Claimant are to be immediately forwarded to Respondent's Counsel.

(Letter to Parties from AAA, September 17, 2002, Ex. 51 to Campisi Aff.).

Defendant seeks to confirm this award.

### DISCUSSION

### I. Legal Standards and Preliminary Legal Determinations

#### A. Applicable Law

The Parties' joint venture agreement states that arbitration will be governed by the laws of the State of New York and the Laws of the United States. The relevant New York statute is CPLR § 7511, which governs vacating or modifying arbitration awards. The relevant federal provision is the Federal Arbitration Act (F.A.A.), 9 U.S.C. 1 § et. seq. There is no conflict between New York and federal law on any of the issues relevant to this dispute, and the holdings of this case can rest on either body of law.

Arbitration is intended to be a faster and less expensive alternative to dispute resolution than a formal court procedure. *British Ins. Co. of Cayman v. Water Street Ins. Co. Ltd.,* 93 F.Supp.2d 506, 516 (S.D.N.Y.2000) (citations omitted). To achieve that goal, arbitrators are permitted to provide equitable relief that a district court could not, without observing all of the rules that the court would be bound to follow. *Id.*

The Second Circuit has held that, "[A]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993). The party seeking to vacate the award has the burden of proof. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997) (citations omitted). An arbitration award should be confirmed as long as there is "a barely colorable justification" for the award. *Andros Compania Maritima, S.A., Marc Rich & Co.,* 579 F.2d 691, 704 (2d Cir.1978) *quoted in Landy Michaels Realty Corp. v. Local 32B–32J, Service Employees International Union,* 954 F.2d 794, 797 (2d Cir.1992).

Under CPLR § 7511(b)(1), an arbitration award can be vacated if the court finds a party's rights prejudiced by: (i) corruption, fraud, or misconduct in procuring the award; (ii) partiality of an arbitrator; (iii) an arbitrator or agency making an award that exceeded his power or so imperfectly executed it that a final and definite award was not made; or (iv) fail-

ure to follow the procedure of the CPLR. N.Y. CPLR § 7511(b)(1)(McKinney 2001). Plaintiffs assert that the challenged awards should be vacated under CPLR § 7511(b)(1)(iii) because the Panel exceeded its power. (Plaintiffs' Memo., p. 5). Plaintiffs and Defendant agree that there are only three grounds for establishing that an arbitrator has "exceeded his power" as the basis for vacating an arbitrator's award: (1) The arbitrator has exceeded a specifically enumerated limitation on his authority; (2) The decision is totally irrational or; (3) The award is violative of a strong public policy. *G.E.I.C.O. Gen. Ins. Co. v. Canal Ins. Co.*, 733 N.Y.S.2d 847, 848, 189 Misc.2d 467, 468 (N.Y.Civ.Ct. 2001); *Matter of Bd. of Educ. v. Dover–Wingdale Teacher's Assn.*, 61 N.Y.2d 913, 915, 474 N.Y.S.2d 716, 463 N.E.2d 32, 32 (1984).

Under Section 10 of the F.A.A., an arbitration motion can be vacated when: (i) the award was procured by corruption, fraud, or undue means; (ii) there was evident partiality or corruption in the arbitrators, or either of them; (iii) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced; or (iv) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a)(3). An award may also be vacated where the arbitrator acts in manifest disregard of the law. *Houdstermaatschappij*, 103 F.3d at 12. Courts have interpreted Section 10(a)(3) to mean that arbitration awards will not be vacated unless there has been a violation of fundamental fairness. *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997)(and cases cited therein).

**B. Judicial Review of Orders**

Interim orders of an arbitrator are not subject to judicial review, *Michaels v. Mariforum Shipping*, 624 F.2d 411, 414 (2d Cir.1980), but disposition of an issue that is separate from other issues before the arbitrators can be deemed final and subject to judicial review. *Sperry Int'l Trade Inc. v. Gov't of Israel*, 532 F.Supp. 901, 906 (S.D.N.Y.1982) An order is considered final and subject to review, even before there is an arbitration hearing on the merits of the claim, if the award "finally and conclusively dispose[s] of a separate [legally] independent claim." *Metallgesellschaft A.G, v. M/V Capitan Constante*, 790 F.2d 280, 283 (2d Cir.1986) *quoted in Banco de Seguros del Estado v. Mutual Marine Offices, Inc.*, 230 F.Supp.2d 362, 368 (S.D.N.Y.2002).

 Arbitrators have the authority to award interim relief in order to protect their final award from being meaningless, *British Ins. Co.*, 93 F.Supp.2d at 516, and equitable awards involving the preservation of assets related to the subject of arbitration are generally considered "final" arbitral awards subject to judicial review. *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1023 (9th Cir.1991)(finding a preliminary procedural award requiring the posting of a security was a final award subject to review, and holding that "[T]emporary equitable orders calculated to preserve assets or performance needed to make a potential final award meaningful…are final orders that can be reviewed for confirmation and enforcement by district courts under the F.A.A.") *cited with approval in Banco de Seguros del Estado*, 230 F.Supp.2d at 368. The Second Circuit has found that a arbitral decision requiring the establishment of an escrow account pending a decision on

the merits is a final award subject to review. *Sperry*, 689 F.2d at 304. Numerous District Courts in the Second Circuit have found that interim, prejudgement security awards are final orders subject to judicial review. *Banco de Seguros del Estado*, 230 F.Supp.2d at 368 (reviewing numerous holdings where a prejudgement security award was found to be final and reviewable).

Plaintiffs argue that all of the awards they seek to vacate are "final" and subject to judicial review, because all of the orders, taken together, "so substantially affect the merits of the parties' claims that they in truth completely resolve them." (Plaintiffs' Memo., p. 10). Defendant does not challenge Plaintiffs' position on reviewabilty. However, I see no merit in Plaintiffs' argument that orders they seek to vacate, taken separately or together, finally resolve the entire case. The parties are winding up their partnership under arbitral supervision. Both sides have sought relief from the Panel on several grounds. Some of that relief is interim relief and some is final in nature (that is to say, it disposes of a claim). Each award must be considered separately to determine if it is subject to judicial review.

1. *The First Award: The Reston Group Contract*

■ The Plaintiffs' claim for arbitration relief asks that the arbitrators provide, "A procedure for the division of the inventory." (Plaintiffs' Claim for Relief Sought, ¶1, Ex. 3 to Campisi Aff.). The first award requires the parties to execute a contract with The Reston Group, which was designated to evaluate and divide the joint venture inventory. The directive to sign the contract binds the parties to a procedure for the division of the inventory. This award finally disposes of Plaintiffs' first claim for relief, and is thus subject to

judicial review. *Metallgesellschaft A.G.*, 790 F.2d at 283 (2d Cir.1986).

Alternatively, this award seeks interim relief that is necessary to prevent a final award from being meaningless. Defendant has counter-claimed seeking "a fair and equitable division of the Joint Venture inventory." (Defendant's Claims for Relief Sought on Counterclaim, ¶1, Ex. 56 to Campisi Aff.). The Panel has determined that the proper means for effecting said division is to have an outside consultant do it. If the parties are unwilling to engage said consultant, the Panel must direct them to do so in order to have any ability to issue a final award directing division of the assets.

2. *The Second and Third Award: Joint Venture Monies and Inventory*

■ The second and third awards relate to the handling of joint venture funds and sales of inventory. The awards are temporary equitable measures designed to ensure that the ultimate award of the arbitration panel is not rendered meaningless through dissipation of its assets. As discussed in Section II(B), *supra*, temporary equitable awards to preserve assets are considered final arbitral awards subject to judicial review. *British Ins. Co.*, 93 F.Supp.2d at 516.

3. *The Fourth Award: Retention of CPA*

■ The fourth award requires Plaintiffs to engage a CPA firm to audit the joint venture, pay the venture's ongoing bills, and maintain signature authority over its accounts. This directive appears to provide some of the relief specifically sought by Defendant in paragraph 3 of its counter-claim for arbitration relief: "appointment of a ... qualified neutral third party with authority to oversee the wind-

ing up and to . . . pay all Joint Venture debts." (Defendant's Claims of Relief Sought on Counterclaim, ¶ 3, Ex. 56 to Campisi Aff.; See Fact Section C, *supra*, for full text of claim.) Indeed, this directive finally disposes of part of defendant's claims as set forth in paragraph 3 of its counterclaim and, read together with the award relating to the retention of Reston, disposes of all of the claims in paragraph 3 (since Reston and the CPA perform all the functions that Duration wants assigned to a "qualified third party)." Thus, it would seem that the appointment of a CPA is a final award that disposes of a separate, legally independent request for relief. *Metallgesellschaft A.G.*, 790 F.2d at 283. The fact that Plaintiffs are allowed to chose which of several firms to engage does not make this an indefinite order, it is a final directive to engage an accounting firm for this purpose.

Alternatively, the retention of a CPA can be seen as an interim equitable order, necessary to preserve the assets of the joint venture, issued in the face of Plaintiffs' repeated and admitted violation of arbitral orders to freeze the status quo. It is reviewable in this context as well.

\* \* \* \* \* \*

Because the awards challenged by the Plaintiffs are subject to judicial review (although not for the reasons that Plaintiffs suggest), it is not necessary to consider Plaintiffs' alternate suggestion that the awards be reviewed based on public policy and "notion[s] of justice." (Plaintiffs' Memo., p. 11).

4. *The Award Defendant Seeks to Have Confirmed: Bank Statements*

■ Defendant's cross-claim seeking confirmation of the September 17, 2002 directive that Plaintiffs send Defendant's counsel copies of joint venture bank statements and reports. While this directive appears to be motivated by an underlying desire to ensure the preservation of assets, it is too attenuated from asset preservation to be considered an award for interim equitable relief. It does not dispose of any separable claim contained in the parties' arbitration demands, as do the Reston and CPA awards. It is an interlocutory order related to an ongoing arbitration. I cannot exercise judicial review over this order, and thus cannot confirm it.

## C. Statute of Limitations

Both federal and state law require that motions to vacate arbitration awards be timely. Under the CPLR, an application to vacate an award must be made within ninety days of delivery of the award. NY CPLR § 7511(a). Under the F.A.A., a motion to vacate must be served on the adverse party within three months after the award is filed or delivered. 9 U.S.C. § 12. According to the accompanying affidavit of service, Plaintiffs' Motion to Vacate was served on Defendant on October 22, 2002. Plaintiffs contend that their motion to vacate is not untimely as to any of the awards, because the earliest challenged letter directive was sent on July 29, 2002. (Plaintiffs' Reply, p. 9). Defendant contends that the first award, relating to The Reston Group, and the second award, relating to the retention of joint venture funds, are actually restatements of earlier awards that were not timely challenged and cannot now be overturned. (Defendant's Opposition, p. 15, 21).

1. *The First Award: The Reston Contract*

■ Defendant argues that Plaintiffs' challenge to the retention of Reston is untimely, because the October 15, 2002 letter directing Plaintiffs to execute the contract with the Reston Group is simply a ministerial follow-up to the Panel's May

22, 2002 directing the parties to "go forward with the inventory project by engaging Reston according to the terms of its proposal." (Letter from AAA to Counsel, May 22, 2002, Ex. 13 to Campisi Aff.). However, the record reveals that the process of engaging Reston was far from final when the order to go forward was issued in May. See Section I.(A), *supra.* The parties were unable to reach an agreement with The Reston Group on the terms of a contract in their post-May 22 discussions with Reston, and Reston withdrew its original proposal, thus rendering the May 22, 2002 order inapplicable. The Panel initiated a new procedure whereby it took over the Reston negotiations. The Panel did not arrive at a final contract with The Reston Group until the fall. It is the directive to execute the contract negotiated by the Panel that finally resolves the parties' request that the arbitrators fix a procedure to divide their inventory. Thus, the October 15, 2002 letter is the final award, and the challenge is timely under both the F.A.A. and the CPLR.

2. *The Second Award: Joint Venture Monies*

█ Plaintiffs' motion to vacate the award directing retention of joint venture monies is clearly untimely. As described in Section I(B), *supra,* on January 16, 2002, the Panel ordered that, "all monies received by the joint venture be retained by the joint venture until the conclusion of this arbitration and the further order of the panel." (Letter to Counsel from AAA, January 16, 2002, Ex. 29 to Campisi Aff.). On February 7, 2002, the Panel denied Plaintiffs' request to reconsider this award. (Letter from AAA to Counsel, February 7, 2002, Ex. 33 to Campisi Aff.). The July 29, 2002 letter, whose vacatur is sought by Plaintiffs, does no more than demand compliance with the award "previously ordered by letter date January 16, 2002." (Letter

from Panel to Counsel, July 29, 2002, Ex. 47 to Campisi Aff.). Plaintiffs are actually seeking to vacate the *underlying* January order, over nine months after it was issued and eight months after the request for reconsideration was denied. As a result, their Motion to Vacate is untimely, under both the F.A.A. and the CPLR, and is denied.

**II. Plaintiffs' Motion to Vacate Awards**

**A. Plaintiffs' Legal Argument**

Plaintiffs presented different legal arguments for vacatur in their original memorandum on October 18, 2002 and in their reply brief and at oral argument on November 12, 2002. In the original memorandum, Plaintiffs argued that the award should be vacated under CPLR § 7511(b)(1)(iii) because the arbitrators exceeded their powers by issuing awards that were both totally irrational and violative of "[the Plaintiffs'] constitutional rights and strong public policy of a party's right to due process." (Plaintiffs' Memo., p. 5,8). Plaintiffs also argued that vacatur was warranted because they were denied a fundamentally fair hearing before the Panel. (Plaintiffs' Memo., p. 8). At oral argument, Plaintiffs continued to assert that they were denied a fundamentally fair hearing. However, they expanded their due process argument by claiming that the Panel's procedures failed to safeguard rights to which they were entitled under New York's Partnership Law, resulting in a deprivation of Constitutional due process. (Plaintiffs' Reply, p. 3–6).

1. *Due Process Arguments*

a. *Public Policy*

█ Plaintiffs' initially argued that vacatur is required under the CPLR because a due process violation is a violation of

public policy. New York law only allows vacatur on public policy grounds when public policy "prohibit(s), in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator." *Arbitration Between Sprinzen and Nomberg,* 46 N.Y.2d 623, 631, 415 N.Y.S.2d 974, 978, 389 N.E.2d 456 (1979). An award will not be vacated on public policy grounds unless the violation is clear on the face of the award, without fact finding and legal analysis. *Id.* Thus, Plaintiffs' claim has no merit.

### b. Constitutional Due Process under the Due Process Clauses

██ Plaintiffs' also advance a Constitutional due process argument, claiming that the Panel deprived them of their property rights without due process of law. However, the Constitutional protection against "depriv[ation] of life, liberty, or property, without due process of law" applies only to deprivations caused by state action. *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)(private conduct not subject to the requirements of the Fourteenth Amendment); *Desiderio v. Nat'l Assoc. of Sec. Dealers,* 191 F.3d 198 (2d Cir.1999) *cert. denied,* 531 U.S. 1069, 121 S.Ct. 756, 148 L.Ed.2d 659 (2001)(Fifth Amendment due process claim requires deprivation by state action). Neither the AAA nor the ICDR is a governmental agency. The arbitrators are private actors, and their directives are not subject to the Due Process Clauses of the Constitution. *Porush v. Lemire,* 6 F.Supp.2d 178, 186 (E.D.N.Y.1998)(denying due process challenge to arbitral award because "private arbitrators are not state actors and, absent state action, there can

be no violation of [the Fourteenth or Fifth Amendments]"); *See also, United States v. American Society of Composers, Authors and Publishers,* 708 F.Supp. 95, 96–97 (S.D.N.Y.1989)(finding that a petitioner claiming that his due process rights were violated by an arbitration panel's methods had "failed to demonstrate any state action which would trigger the applicability of the due process clause.") For that reason, the Plaintiffs' reliance on *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); *Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W.T. Grant Company,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); and *Tri–State Development, Ltd. v. Johnston,* 160 F.3d 528 (9th Cir.1998) is misplaced. Each of these cases concerns a deprivation of property rights pursuant to a state statute or state procedure, and the Fourteenth Amendment clearly applies.

### c. Procedural Due Process

██ While the awards of private arbitrators are not subject to substantive Due Process analysis, there is a general requirement under New York law that arbitration procedures comport with due process of law by providing a party with notice and an opportunity to be heard.[2] *See, e.g., Matter of Beckman v. Greentree Securities, Inc.,* 87 N.Y.2d 566, 570, 640 N.Y.S.2d 845, 663 N.E.2d 886, 888 (1996)(considering whether notice of arbitration procedures was sufficient to provide appellant with due process of law). Under federal law, "fundamental fairness"

---

2. The due process requirement that parties receive adequate notice and an opportunity to be heard is derived from the Due Process Clauses of the Constitution. However, the fact that arbitration procedures must provide parties with due process of law does not make arbitration awards, absent state action, subject to the Fifth or Fourteenth amendment. Plaintiffs conflate the two "due process" analyses.

requires that each party have an opportunity to present its evidence and argument. *Tempo Shain,* 120 F.3d at 20 *citing Hoteles Condado Beach v. Union De Tronquistas Local 901,* 763 F.2d 34, 39 (1st Cir.1985). Plaintiffs argue that the issuance of the challenged awards without a prior evidentiary hearing, at which witnesses testified and oral argument was held, denied them an opportunity to be heard, in violation of their procedural due process rights and fundamental fairness. Plaintiffs' argument is wrong.

Arbitrators must give both parties to the dispute an opportunity to present their evidence and argument. An award can be vacated if an arbitrator refuses to hear material and pertinent evidence. *Areca, Inc. v. Oppenheimer & Co.,* 960 F.Supp. 52, 54 (S.D.N.Y.1997). However, arbitrators are not required to hear *all* of the evidence, and are afforded broad discretion in determining what evidence is necessary, as long as they allow each party an "adequate opportunity to present its evidence and argument." *Tempo Shain,* 120 F.3d at 20 *quoting Hoteles Condado Beach,* 763 F.2d at 39. *See also British Insurance Co. of Cayman,* 93 F.Supp.2d 506, 517 (S.D.N.Y.2000)(citing above cases with approval for same propositions). It does not violate due process to issue a decision based on a written submission. An arbitrator has the discretion to chose not to hold oral hearings, as long as his decision based on other evidence is reasonable and not fundamentally unfair. *British Ins. Co.,* 93 F.Supp.2d at 517 (and cases cited therein). This court has previously found that the lack of a formal, oral hearing does not violate F.A.A. 10(a)(3) and is not fundamentally unfair. *Arbitration Between Cragwood Managers, L.L.C. and Reliance Ins. Co.,* 132 F.Supp.2d 285 (S.D.N.Y.2001).

Nothing in the record before me suggests that the Panel failed to give Plaintiffs an opportunity to submit evidence and argument. The record before me indicates that no award even issued from the Panel before the parties had ample opportunity to make their position known to the Panel. Both sides presented information and arguments on every question implicated by the awards. The Panel did not dictate what the parties were or were not to submit. Plaintiffs were free to submit testimony by affidavit if they wished and, significantly, there is no evidence that either party ever attempted to present any evidence that the Panel refused to receive.

Plaintiffs repeatedly characterize the evidence presented as "unsworn" and emphasis that it came from the parties' attorneys, and not the parties themselves (although there is no allegation that the attorneys were not representing the parties appropriately). This is irrelevant. It is well established that arbitrators can make evidentiary determinations and "need not follow all the niceties observed by the federal courts. [The arbitrators] need only grant the parties a fundamentally fair hearing." *Bell Aerospace Co. Div. of Textron v. Local 516,* 500 F.2d 921, 923 (2d Cir.1974).

Plaintiffs cite *Tempo Shain* to support the claim that they were denied a "meaningful hearing." (Plaintiffs' Memo., p. 8). However, the facts of *Tempo Shain* are very different from those at bar. In *Tempo Shain,* an arbitration panel conducted oral hearings, but concluded them without hearing from the only witness who could provide crucial evidence. The witness was temporarily unable to testify, due to his wife's diagnosis with a reoccurrence of cancer; the panel refused to grant an adjournment, and claimed that his testimony was cumulative. *Tempo Shain,* 120 F.3d at 20. The Second Circuit found no rea-

sonable basis for the arbitration panel to have so determined. *Id* at 17. In a subsequent case, this Court held, "[T]he essential proposition for which *Tempo Shain* stands is that, absent a reasonable basis for its decision, a refusal to grant an adjournment of a hearing, due to a medical emergency, constitutes misconduct under the [F.A.A.] if it excludes the presentation of evidence material and pertinent to the controversy thus prejudicing the parties in the dispute and making the hearing fundamentally unfair." *Bisnoff v. King,* 154 F.Supp.2d 630, 638 (S.D.N.Y.2001). *Shain* does not require arbitrators to hold oral hearings.

Plaintiffs also attempt to support their claim that live evidentiary hearings are required by citing, *In re Yorktown Sportswear Co. Inc.,* 1973 WL 17019 (N.Y.Sup.Ct.1973)(Plaintiffs' Memo., p. 7). In *Yorktown,* the New York Supreme Court vacated two temporary injunction awards due to a number of defects which made the award incomplete and subject to vacatur under CPLR 7511(b)(1)(iii). While the *Yorktown* court discusses the lack of meaningful hearings in its analysis, the court did not hold that due process requires oral evidentiary hearings.

Even in the context of a judicial (as opposed to an arbitral) determination, an oral evidentiary hearing is not always the *sin qua non* of due process. In *SEC v. Elliott,* 953 F.2d 1556, 1560 (11th Cir. 1992), the Eleventh Circuit directed the District Court to hold an "evidentiary hearing" for two claimants in a massive receivership, based on the fact that they had complicated claims, which they had been given no opportunity to explain. *Elliott,* 953 F.2d at 1558. The Circuit did not direct that an evidentiary hearing must be held for the other 1,062 claimants. And for the hearing that they did order, the Court of Appeals "left the structure of the hearing to the discretion of the district court so long as the [two claimants] can present and argue their facts." *Id.*

Thus, it can hardly be the case that an arbitral award made on a written submission, where the parties had discretion to present the arbitrators with any information they thought relevant, including written sworn testimony if they wished, violates due process or denies fundamental fairness. Plaintiffs have only themselves to blame if they did not include relevant material in their written submissions, against some possibility that oral hearings would be held. *See generally, Porush,* 6 F.Supp.2d at 182 ("arbitration is not a trial run in which an arbitral respondent may sit silently by, take note of the evidence presented without attempting to clarify the matters presented to the arbitrators, and then, if the result turns out unfavorably, seek judicial relief on the grounds that the arbitrators misapprehended the facts.").

### 2. *Irrationality*

Plaintiffs also argue that the Panel also exceeded its power by issuing awards that are "totally irrational." (Plaintiffs' Memo., p. 8). Plaintiffs did not mention this legal basis for vacatur in their reply brief or at oral argument, instead focusing entirely on the due process argument.

For a Court to grant vacatur on the grounds that an award is totally irrational, "there must be no proof whatever to justify the award." *G.E.I.C.O.,* 189 Misc.2d at 468, 733 N.Y.S.2d 847 *quoting Matter of Peckerman v. D & D Associates,* 165 A.D.2d 289, 296, 567 N.Y.S.2d 416, 420( 1st Dep't 1991). Plaintiffs argue that "Relying merely on correspondence is not a rational basis for issuing an award." (Plaintiffs' Memo., p. 8). There is no support for the proposition that written submissions can not provide a rational basis for an arbitral award. In the cases that

Plaintiffs cite, there is no rational basis of any kind for the arbitral award. *G.E.I.C.O.,* 189 Misc.2d at 469, 733 N.Y.S.2d at 848 (award vacated when it relied on the hearsay in one police report and was contrary to a jury verdict, and was thus "lack[ing in] evidentiary support," "arbitrary," and "capricious"); *In re: Alstante,* 259 A.D.2d 964, 964–965, 689 N.Y.S.2d 321, 321 (motion vacated when arbitrator's decision was based on an assumption, and was self-contradictory); *Recore v. Chateugay Central School District,* 256 A.D.2d 801, 681 N.Y.S.2d 621 (3d Dep't.1998)(rehearing on motion to vacate ordered when the record suggested that the arbitrator based his award not on the grievance before them, but on an arbitral award concerning a previous grievance).

Thus, as long as the written submissions gave the arbitrators some basis for their determinations, the awards will not be vacated as irrational.

## B. Application of the Above Rulings to the Challenged Awards

### 1. *First Award: The Reston Contract*

#### a. *Procedural Due Process*

■ Plaintiffs object to "terms and conditions of the Reston agreement which are being forced on Plaintiffs by the Panel without a hearing." (Affidavit of Andrew J. Goodman, November 12, 2002, ¶ 4). As detailed in Fact Section A, *supra,* the Panel issued the directive that the parties execute the Reston agreement after extensive negotiation and consideration of the submissions of both parties. Plaintiffs had numerous opportunities to present evidence and arguments regarding both how to divide the inventory and the retention of the Reston Group. The Panel had heard the parties' positions on the relevant issues as they negotiated the final contract. As noted above, Plaintiffs do not point to evidence they proffered to the Panel, but that the Panel refused to hear.

#### b. *Irrationality*

■ The process described in Fact Section A, *supra* also establishes that the directive to execute the Reston agreement was not "totally irrational." The Panel received lengthy and detailed written submissions regarding the division of inventory from both the Plaintiffs and the Defendant. See Fact Section A, *supra.* Attached to Defendant's sixteen-page submission on the presentation of inventory were eight supporting exhibits, including photographs of the joint venture warehouses. (Campisi Aff. ¶ 27). The parties' attorneys discussed and debated the division of inventory with the Panel on November 29, 2001 and January 14, 2002. (Campisi Aff. ¶ s 24, 31). Before selecting The Reston Group from the lists of consultants suggested by the parties, the Panel requested that Reston and the other finalists inspect the joint venture warehouses and submit specific bids. Id at ¶ 36. After the parties were unable to finalize a contract with the Reston group, the Panel negotiated directly with Reston to create a contract. Id at ¶ s 40–41. The Panel was well informed of the issues surrounding the division of the joint venture, and of the specific provisions of the Reston contract. The directive to execute the Reston contract was not arbitrary, capricious, or lacking in evidentiary support.

### 2. *Second Award: Joint Venture Monies*

As noted above, the second award, regarding the retention of joint venture funds, was issued in January 2001, and the motion to vacate is thus untimely and not subject to judicial review. See Section I(C)(2) *supra.*

### 3. Third Award: Joint Venture Inventory

 Plaintiffs repeatedly told the Panel and the Defendant that they were selling joint venture inventory. Defendant raised concerns about Plaintiffs' selling inventory that was about to be divided. (Letter from Campisi to AAA, Ex. 36 to Campisi Aff.). As described in Fact Section C, *supra*, the Panel received numerous detailed written submissions from both parties regarding the sale and division of inventory. Again, no one asserts that either party attempted to introduce any evidence on this issue that was not accepted by the Panel. The issuance of this award was not fundamentally unfair, and did not violate due process.

 Plaintiffs contest this award by strenuously asserting that they are entitled to liquidate assets of the joint venture under New York Partnership Law § 68 and to distribute joint venture property under New York Partnership Law § 69. These provisions are part of Article 6 of the New York Partnership Law, which governs the rights and responsibilities of partners when partnerships are in dissolution and wind up. Sections 68 and 69 establish the rights of partners, under certain conditions, to sell and apply joint venture assets *"unless otherwise agreed."*

In the instant case, Plaintiffs and Defendant *have* otherwise agreed. The parties attempted to wind up their joint venture on their own for approximately three years, but were unable to resolve their disputes regarding the dissolution and wind up. (Campisi Aff. ¶s 12–20). The parties then voluntarily submitted claims to the American Arbitration Association, pursuant to their joint venture agreement.[3]

Id. The arbitration clause represented an agreement by the parties on how to handle disputes arising out of their joint venture that they could not resolve on their own. By submitting their dissolution to arbitration, they "otherwise agreed" that their contentious dissolution and wind up would be directed by the arbitrators. Thus, whatever Article 6 of the New York Partnership law provided in the ordinary course, Plaintiffs had no right to sell and apply joint venture assets unilaterally and in violation of the arbitrators' directives, because they agreed to resolve all disputes relating to the wind up of their affairs under the watchful eyes of the arbitrators. *See generally, Waddell v. Shriber*, 465 Pa. 20, 348 A.2d 96, 101–102 (1975)(arbitration agreement established that parties' dispute regarding termination should be resolved by arbitration, despite appellee's assertion that termination should be governed under the terms of a Pennsylvania partnership law provision identical to N.Y. Partnership Law § 68).

### b. Irrationality

 The process described in Fact Section C, *supra*, also establishes that the directive to stop the sale of inventory without Panel approval was not "totally irrational." On January 23, 2002, Plaintiffs provided sales records and invoices to the Panel and to Defendant, pursuant to the Panel's directive. (Letter from Plaintiffs to AAA, January 23, 2002, Ex. 30 to Campisi Aff.). The Defendant responded with a detailed written submission, in which they raised specific concerns that three of the invoices involved sales that had never been reported to Defendant. Id. Defendant also expressed concern about the im-

---

**3.** The arbitration clause of the joint venture agreement provides that "Any disputes between the parties arising out of this Agreement" will be resolved by a CPA, and if the parties can not agree upon the appointment of a CPA, the matter will be submitted to the American Arbitration Association.

proper handling of sales, and the lack of sales documentation. (Letter from Defendant to AAA, January 31, 2002, Ex. 31 to Campisi Aff.). These letters, and the numerous letters that followed, were evidence of the distrust between the parties, and suggested that the parties would have difficulty acting as each other's fiduciaries. The Panel may have concluded that the sales records evidenced impropriety in Plaintiffs' actions; that there was a danger that the Plaintiffs would not discharge their fiduciary obligations to Defendant; or that it was unwise for Plaintiffs to be selling inventory while the Panel was in the process of negotiating with The Reston Group over the terms of its engagement to evaluate and divide that very inventory. Under any of these rationales, there was proof to support the Panel's conclusion. As discussed above, an arbitral award should not be vacated as irrational unless there is no proof to justify the award.

### 4. Fourth Award: Retention of CPA

#### a. Due Process

 The directive to engage a CPA firm to serve as a neutral third party in the face of Plaintiffs' refusal to abide by arbitral awards was issued after both parties were given the opportunity to present their views to the Panel. In addition, the Panel had received information regarding the joint venture accounts through their consideration of other issues. See Fact Sections B and D, *supra.* Once again, no party alleges that the Panel declined to hear evidence that was tendered to it before issuing the award. The issuance of this award does not violate due process or fundamental fairness.

#### b. Irrationality

 The process described in Fact Sections B and D, *supra,* establishes that the directive to order agreement was not

"totally irrational." In July 2002, Plaintiffs distributed over $265,000 in joint venture assets, in direct contravention of the Panel's order that all assets should be retained by the joint venture. (Letter from Plaintiffs to AAA, July 15, 2002, Ex. 44 to Campisi Aff.). Defendant advised the Panel that the Plaintiffs were not providing them with complete records of joint venture accounts. (Letter from Defendant to AAA, July 16, 2002, Ex. 45 to Campisi Aff.). The bitter nature of the conflict between the parties, and the evidence that Plaintiffs were handling monies in contravention of the direct orders of the Panel, support the Panel's decision to remove the accounts from the exclusive control of the Plaintiffs. There is proof to justify the award, and it is neither arbitrary or capricious.

\* \* \* \* \* \*

CPLR § 7511(e) provides that upon a denial of a motion to vacate, a court should confirm an award. The F.A.A., 9 U.S.C. § 9 provides that upon an application for an order to confirm an arbitration award, the court must do so, unless the award is vacated, modified, or corrected under § 10 or § 11. I have denied a motion to vacate under § 10. Since both parties vigorously contested the issues relevant to the validity of the awards, I will treat the Defendant's opposition to vacatur as a request for confirmation under 9 U.S.C. § 9.

Should the appointment of a CPA neither finally dispose of a separate claim nor provide temporary relief to protect assets, then the order is non-final and not reviewable at this time. In no event can the order be vacated, as Plaintiffs request. If it is not final, it cannot be confirmed either. For the reasons stated above, I think the award is sufficiently final to be reviewed.

I deny Plaintiffs' motion to vacate the arbitration awards challenged by Plaintiffs, and hereby confirm them.

### III. Defendant's Cross–Motion Requesting Various Orders in Aid of Arbitration

Defendant asks this Court to enter several orders compelling Plaintiffs to comply with the various awards that have now been confirmed. While Plaintiffs' behavior to date does not inspire confidence, I believe I should give Plaintiffs the opportunity to demonstrate that they can and will comply with *confirmed* awards—and also give the arbitrators the opportunity to deal with perceived affronts to their jurisdiction, rather than interposing the Court into a non-judicial process without need. Should it prove necessary for Defendant to apply for an injunction in aid of arbitration, they know where the courthouse is.

This constitutes the decision and order of the Court.